Aleksandra Peryeva, Esq
Curran, Berger & Kludt
79 Masonic Street
Northampton, MA 01060
ap@cbkimmigration.com
(413) 584-3232
Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS
## WESTERN DIVISION

| | |
|---|---|
| LESLEY LAMARCHE, LATIFA RAHIMI, SONA RAHIMI, FAZAL AHMAD FAZLI, ENGEEL FAZLI, MOHAMMAD RIAZ FAZLI, MOHAMMAD SOMAN FAZLI, MOHAMMAD SUBHAN FAZLI, NABIA FAZLI, AHMAD FARID TEMORY, AMINULLAH NOORI, MAHBOBA HASAN ZAI, HAFASA TEMORY, YASAMIN TEMORY, GULL DANA WARDAK, AND ABDUL WAKIL TEMORY<br><br>Plaintiffs,<br><br>v.<br><br>ALEJANDRO N. MAYORKAS, Secretary of the U.S. Department of Homeland Security;<br>UR M. JADDOU, Director of the United States Citizenship and Immigration Services; and<br>ANTONY J. BLINKEN, U.S. Secretary of State;<br><br>Defendants. | Civ. Case No. 3:23-cv-30029 |

### COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

1. The Plaintiffs are Afghans endangered by the Taliban's return to power and U.S.-based loved ones attempting to bring them to safety.

2. Plaintiff Lesley LaMarche, a U.S. citizen, lives in Massachusetts and volunteers as an English teacher at the Alliance for International Women's Rights. Through her work, Lesley

1

became acquainted with Sona Rahimi and Latifa Rahimi, two young female human rights advocates and citizens of Afghanistan. When the Taliban took control of Afghanistan in August 2021, Ms. LaMarche knew that the Rahimi sisters and their relatives who remained there would be in peril. She learned that U.S. Citizenship and Immigration Services ("USCIS") had put forward a process known as "humanitarian parole," through which she could apply to bring them to the United States based on "urgent humanitarian reasons." She applied for two separate families – Rahimi sisters and Fazli family - and requested expedited treatment.

3. Plaintiff Ahmad Farid Temory has been evacuated to the U.S. He now resides in Massachusetts. When the Taliban took control of Afghanistan, Mr. Temory, who was working with U.S. military, and his family found themselves in grave danger. Luckily, because of Mr. Temory's connection to the U.S., he was instructed to arrive for evacuation to Kabul airport with his family. However, while already in the airport and ready to board the plane, his family was separated by the U.S. military personnel. Mr. Temory and his four children boarded the plane and ultimately reached safety in the U.S. His wife and two other children, his mother and brother, however, remained behind and were forced into hiding. As soon as Mr. Temory arrived in the U.S. and found out that his family members were left behind, he filed their applications to bring them to safety. While he was still on the military base undergoing screening, he asked his U.S. citizen sister, Aminullah Noori, to petition for Mr. Temory's family members.

4. Over time, USCIS's commitment to the humanitarian parole process foundered. After prompting thousands of hopeful Afghans to submit parole applications (and pay millions of dollars in application fees), USCIS changed the rules, setting new standards that effectively ensured the overwhelming majority of Afghan parole applications would be denied—if they were adjudicated at all. Ms. LaMarche's and Mr. Temory's applications languished.

5. The government has violated its duty to adjudicate the applications within reasonable time. It's failure to process the applications (many of which were filed more than 12 months ago)

is unreasonable and unjustified. The Plaintiffs ask this Court to require that all of the Plaintiffs' applications be adjudicated within a reasonable time and pursuant to proper procedures and to the standards that USCIS had in place on August 31, 2021.

## PARTIES

6. Plaintiff Lesley LaMarche is a U.S. citizen living in Massachusetts. She petitioned USCIS for humanitarian parole for Latifa Rahimi, Sona Rahimi, Fazal Ahmad Fazli, Engeel Fazli, Mohammad Riaz Fazli, Mohammad Subhan Fazli, Mohammad Soman Fazli, and Nabia Fazli.

7. Plaintiff Ahmad Farid Temory is a TPS holder Afghan national living in Massachusetts who was separated from his family members by U.S. military personnel during the evacuation. At his request, Plaintiff Aminullah Noori, his U.S. citizen sister, petitioned to USCIS for humanitarian parole for the family members who were left behind: Hafasa Temory, Yasamin Temory, Mahboba Hasan Zai, Gull Dana Wardak and Abdul Wakil Temory.

8. Defendant Alejandro N. Mayorkas, named in his official capacity, is the Secretary of the U.S. Department of Homeland Security.

9. Defendant Ur M. Jaddou, named in her official capacity, is the Director of the U.S. Citizenship and Immigration Services. USCIS is a component agency of DHS that adjudicates applications for immigration benefits, including humanitarian parole.

10. Defendant Antony J. Blinken, named in his official capacity, is Secretary of the U.S. Department of State, which has a role in screening and issuing travel documents to those granted humanitarian parole by USCIS.

## JURISDICTION AND VENUE

11. Jurisdiction of the Court is predicated on 28 U.S.C. §§ 1331 (federal question), 2201 (declaratory judgment), and 1361 (mandamus).

12. Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e) because

Plaintiffs Lesley LaMarche and Ahmad Farid Temory reside in this district, and the Defendants are U.S. agencies and officers sued in their official capacities.

## BACKGROUND

### I. The United States' withdrawal from Afghanistan left thousands of U.S.-allied Afghans in danger.

13. On August 30, 2021, the United States ended a 20-year intervention in Afghanistan. Amid the departure of U.S. and NATO forces, the U.S.-backed Afghan government quickly collapsed. By August 15, 2021, the Taliban had completed their takeover of Afghanistan, moved into the capital, Kabul, and occupied the presidential palace.

14. The Taliban's seizure of power immediately placed in danger Afghans who had worked with U.S. armed forces, those who had served in military or other government functions in the U.S.-backed Afghan government, and their families. Those at immediate risk also included journalists, academics, human rights activists, ethnic minorities, and women, among others.

15. The United States airlifted more than 100,000 Afghan nationals out of the country in the final weeks of August 2021. Through a memorandum issued on August 23, 2021, Secretary Mayorkas authorized U.S. Customs and Border Protection ("CBP"), a component agency of DHS, to parole many of these Afghans into the United States under 8 U.S.C. § 1182(d)(5) on a case-by-case basis. CBP ultimately paroled approximately 70,000 Afghans from U.S. military bases and other sites around the world into the United States.

16. Nevertheless, the evacuation efforts left thousands of U.S.-allied and other at-risk Afghans behind. Many made it to the airport, but could not board flights, or lost family members in the chaos at the airport. Additionally, thousands of Afghans who were allied with U.S. military and organizations never made it to the airport because it was dangerous to even try to get there.

17. In the weeks that followed, tens of thousands of vulnerable Afghans who had been left behind sought help from USCIS through applications for a form of relief called humanitarian

4

parole.

## II.     USCIS held out the prospect of humanitarian parole.

18.     As the military evacuation effort came to a close, USCIS appeared poised to help U.S. allies in Afghanistan. USCIS identified humanitarian parole as an avenue for Afghans seeking entry to the United States. Unlike certain other forms of relief, humanitarian parole does not have rigid eligibility constraints.

19.     Rather, under the Immigration and Nationality Act, the Secretary of Homeland Security is authorized "to parole any [noncitizen] into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

20.     This type of parole can be granted by different DHS subagencies. For example, CBP can grant humanitarian parole to individuals arriving in person at U.S. ports of entry. This was the process used to bring about 70,000 airlifted Afghans into the United States for eventual resettlement. And USCIS receives and adjudicates applications for humanitarian parole under the same statute made on behalf of noncitizens who are outside the United States—the process Plaintiffs here utilized.

21.     A grant of humanitarian parole allows noncitizens to enter the United States temporarily, often for one year, during which they may apply for asylum or other immigration benefits, if eligible.

22.     Anyone may apply for humanitarian parole on behalf of a noncitizen overseas (or the noncitizen may self-petition) by filing Form I-131 Application for Travel Document and a Form I-134 Affidavit of Support from a sponsor that is willing to provide financial support if needed. USCIS charges an application fee of $575 for every application for humanitarian parole; if multiple adults and children from a single family apply for humanitarian parole, they must each pay the $575 fee (for a family of five filing fees would amount to $2,875).

23. On August 26, 2021, USCIS published a webpage specifically providing "Information for Afghan Nationals on Parole into the United States." This Afghan-specific humanitarian parole page explained that "Individuals who are outside of the United States may request parole into the United States based on urgent humanitarian or significant public benefit reasons for a temporary period, on a case-by-case basis." It provided that "[a]nyone may request parole for themselves, or on behalf of another individual," by filling out the form.

24. The website instructed applicants to "[w]rite 'Afghanistan Humanitarian Parole' on the mailing envelope," and "[f]or expedited processing, write the word EXPEDITE in the top right corner of the application in black ink." It told beneficiaries without passports to provide "available identity documentation and an explanation of why they do not have an Afghan passport."

25. The website further explained that "beneficiaries . . . may need to arrange travel to a U.S. embassy outside of Afghanistan to continue processing their parole request."

26. On August 26, 2021, USCIS also modified its general humanitarian parole webpage by adding a banner that directed Afghan nationals to the agency's new Afghan-specific humanitarian parole webpage.

27. Until early September 2021, USCIS acted with reasonable dispatch to address Afghan humanitarian parole applications considering the dangerous situation beneficiaries faced. On information and belief, USCIS approved—or at least conditionally approved, subject to screening at a consulate—most if not all Afghan humanitarian parole applications adjudicated during that period. The agency instructed those grantees who were still in Afghanistan that completing the humanitarian parole process would require travel to a U.S. consulate.

III. **As applications increased, USCIS unreasonably slowed down adjudicating humanitarian parole applications on behalf of Afghans.**

28. As USCIS could reasonably have expected when it held out the prospect of humanitarian parole for Afghans—particularly in light of the dire situation on the ground—the

6

agency received thousands of applications for humanitarian parole for Afghans beginning in late August 2021.

29. These applications reflected a significant mobilization on behalf of the Afghan community in the United States, attorneys, nonprofit organizations, and the public at large to fill out necessary forms, gather supporting documents, and raise money for filing fees. On information and belief, in a few short months, the agency collected more than $20 million in filing fees in connection with humanitarian parole applications for Afghans.

30. However, USCIS has appeared reluctant to process the applications at all, leaving applicants in limbo for months and months. This continued even when applicants properly used the procedure to request Expedited processing, as was described on the USCIS website.

31. Based on data, it appears that from September to November 2021 USCIS stopped adjudicating Afghan humanitarian parole applications, but it continued to adjudicate applications filed on behalf of nationals of other countries.

32. On information and belief, USCIS has now processed only about 2,600 Afghan humanitarian parole applications of more than 45,000 that it has received since July 2021.

33. Even with a huge increase in USCIS staffing, it would take several years to process all 45,000 Afghan humanitarian parole applications at the current pace—a pace that is all the more unreasonable considering the dire humanitarian situation of those seeking this benefit.

34. In recent weeks, Afghan applicants have seen USCIS demonstrate its ability to expeditiously respond to a crisis through humanitarian parole. Under USCIS's new humanitarian parole process for Ukrainians, a U.S.-based sponsor can file an application online, and when it is approved, the Ukrainian beneficiary can register with USCIS electronically and attest that they meet all requirements to enter the United States. The filing fee is waived. And without requiring travel to a consulate, USCIS issues electronic travel authorizations that allow travel to the United States for further processing by CBP upon arrival. USCIS processed over 6,000 such applications within the

first three weeks—far exceeding the total number of Afghan humanitarian parole adjudications in the nine months since August 2021.

### IV. As applications increased, USCIS changed course and adopted standards and procedures that facilitated the denial of applications.

35. Additionally, after tens of thousands of Afghans applied for humanitarian parole under the standards existing in August 2021, USCIS abandoned those standards and adopted new ones.

36. The new standards operated on at least two fronts to ensure that the vast majority of Afghan humanitarian parole applications would be denied. First, on information and belief, USCIS decided that, as a rule, it would *not* issue approvals or conditional approvals for noncitizens who were still in Afghanistan. Instead, USCIS decided that the only decisions it would issue for beneficiaries who were still in Afghanistan were (1) denials, or (2) letters administratively closing an application until such time as USCIS was notified that the beneficiary had left Afghanistan. On information and belief, this rule relied on the absence of a U.S. consulate in Afghanistan—a reality that already existed and USCIS acknowledged when it was still granting approvals or conditional approvals to vulnerable noncitizens in Afghanistan and when it took pains to inform vulnerable Afghans and their advocates that they could apply for humanitarian parole.

37. Second, on information and belief, at the same time that it determined it would not grant humanitarian parole to Afghans *in Afghanistan*, USCIS also instructed its adjudicators that applications filed on behalf of individuals who *had already left Afghanistan* could be approved only in extreme cases in which beneficiaries faced either imminent harm in the country in which they were present or an imminent risk of being returned to Afghanistan.

38. Afghan applicants and beneficiaries seeking humanitarian parole from USCIS— including the plaintiffs here—relied on the existence of a process that would be open and fair. Applicants often made life decisions about where to go and what to do based on the hope of action

on their applications. For many families, there was and is no backup plan, no other contemplated or available pathway to safety or stability.

39. While the Afghans who arrived via the airlift were quickly granted parole by CBP, those left behind have had to wait and watch as written and binding policies were ignored, standards were changed, and tens of millions of dollars in application fees entered government coffers while their families were left stranded, in imminent danger, and without hope.

40. Meanwhile, Afghans confront an economy in shambles, continual terror attacks by the group known as "ISIS-K," and a Taliban regime brutally cracking down on its opponents. In recent weeks, faced with the beginnings of an armed resistance dominated by ethnic Tajiks, the Taliban have responded with extra-judicial killings and harsh reprisals, especially against Tajiks. Women also face increasing restrictions: they cannot study beyond primary school, work in most jobs, or go outside without a male relative and clothing that covers them from head to toe. What is more, the Taliban are reportedly working to improve their technology and surveillance infrastructure with possible foreign assistance—posing grave threats to Afghans who have Western ties or are seeking help to get to the United States, including the Plaintiffs here.

## STATEMENT OF FACTS

41. The Plaintiffs are U.S.-based applicants and Afghan beneficiaries of humanitarian parole applications. In late 2021, and early 2022 they filed several humanitarian parole petitions for individuals in grave danger in Afghanistan. Each requested expedited treatment of their application. Given the dangers individuals and their families faced, they reasonably believed that USCIS would take prompt action to provide them with protection. They did not know and could not have imagined that USCIS would cease treating their applications as urgent and decline to take action for over a year.

42. Plaintiff Lesley LaMarche became closely acquainted Sisters Latifa and Sona Rashmi when she was a volunteer English language coach at the Alliance for International Women's Rights,

9

something she started in 2016.

43. Sisters Latifa and Sona Rahimi are young female human rights activists. They advocated for the education of females prior to the August, 2021. Their public advocacy for human rights and female education included traveling to different areas, speaking with religious leaders and community representatives, and speaking on the TV and radio. Their rhetoric was bold and they received threats and disapproving messages even before August 2021. After Taliban took over Afghanistan, the Rahimi sisters were in immediate grave danger as their activities were in defiance of what the Taliban regards as "strict Islamic values".

44. In September 2021, Lesley LaMarche, realizing the urgency of their situation, submitted I-131 applications with the appropriate documents and filing fees and requested expedited processing for these applications. Receipt numbers: IOE0914629721 and IOE0914629722.

45. Latifa and Sona Rahimi's humanitarian parole applications have been pending with USCIS for almost 18 months.

46. Latifa and Sona Rahimi continue to be in grave danger. They do not have reliable housing, lack food and clothing. They are not able to leave the place where they are staying and only rely on male relatives bringing them food and necessities from time to time. They are terrified that the Taliban are now arresting women and they are in constant fear to be the next in line.

47. In March 2022 Plaintiff Lesley LaMarche also submitted and six additional I-131 applications for Latifa and Sona Rahimi's relatives who also were in grave in danger in Afghanistan: Fazli family: Fazal Ahmad Fazli, his spouse, Nabia Fazli, and four children, Engeel Fazli, Mohammad Riaz Fazli, Mohammad Subhan Fazli, and Mohammad Soman Fazli.

48. Fazal Ahmad Fazli has worked 20 years for the Afghan government as a member of Presidential Protective Service. He investigated all Arg Presidential Palace workers to make sure they did not have connections to the Taliban. Additionally, he advanced the goals of the U.S. mission in Afghanistan by vetting Arg Presidential Palace personnel for Taliban terrorists. In order

10

to qualify for this role, he was trained by Greg Mulligan, Committee Team Leader & Hal Poff, Program Manager, of the U.S. Department of State Bureau of Diplomatic Security Office of Antiterrorism Assistance. Since the Taliban took over, he and his family have been in immediate grave danger in Afghanistan due to his governmental service and affiliation with the U.S. military.

49. Lesley LaMarche, realizing urgency of the situation, submitted I-131 applications with the appropriate documents and filing fees for Fazal Ahmad Fazli and his family and requested expedited processing for these applications. Receipt numbers: IOE0915580472, IOE0915580473, IOE0915580474, IOE0915580475, IOE0915580476, and IOE0915580477.

50. Fazli's family's humanitarian parole applications have been pending with USCIS for almost 12 months.

51. Fazal Ahmad Fazli and his family continue to be in grave danger in Afghanistan. Fazal is living in an undisclosed location from his family because Taliban is hunting him. In the fall of 2022, he closely escaped the Taliban ride that came looking for him. His family is suffering without his support. His wife and children aged 4, 6, 7 and 9 years old live in unreliable housing without a male presence in the house and therefore are not allowed to leave, even if they wanted to, per the strict new Taliban regime rules. They often suffer from scarce of food, water, medication and warm clothing.

52. Mr. Ahmad Farid Temory is a citizen of Afghanistan, currently residing in Massachusetts and holding TPS status. Prior to August 2020, Mr. Temory was an Afghan police commander, senior HR manager of police headquarter for seven provinces. He worked for the Afghan police for more than 16 years and collaborated with U.S. military forces in Afghanistan. After the Taliban took over Afghanistan, Mr. Temory was included in the evacuation list due to his affiliation with U.S. military. Tragically, when Mr. Temory and his family appeared for evacuation to Kabul airport, U.S. military personnel separated Mr. Temory's family in two groups. Mr. Temory and four of his children were instructed to board the plane, while his wife, with two more children,

elderly mother and brother were instructed to wait for the next vessel. After Mr. Temory arrived to the U.S., he realized that half of his family was left behind in Afghanistan.

53. On December 6th, 2021, Aminullah Noori, sister of Mr. Temory, who has been residing in the U.S. for about 20 years already, at the request of Mr. Temory, filed I-131 humanitarian parole applications for his family members who remained in Afghanistan: Hafasa Temory, Yasamin Temory, Mahboba Hasan Zai, Gull Dana Wardak and Abdul Wakil Temori. She submitted I-131 applications with the appropriate documents and filing fees and requested expedited processing for these applications. Receipt numbers: IOE0915580472, IOE0915580473, IOE0915580475, IOE0915580476, IOE0915580477

54. The Temory family humanitarian parole applications have been pending with USCIS for over 12 months.

55. The Temory family continues to be in grave danger in Afghanistan. When the Taliban found out that he and half of his family had escaped, the danger for the remaining women in Afghanistan increased. They now live with no rights, no access to necessary living amenities, and are constantly threatened by the Taliban as the remaining relatives of Ahmad Farid. Being specifically targeted with threats of violence, the fear that the women in Afghanistan feel reflect a real and severe crisis. Mahboba Hasan Zai, Mr. Temory's wife, used to be a school teacher. She is no longer allowed to work as a teacher. Hafasa Temory and Yasamin Temory, Mr. Temory's older daughters, are no longer allowed to pursue their education. Abdul Wakil Temori, brother of Mr. Temory, is in danger as Mr. Temory's family member but also due to his own civil rights activism. The family has had to move numerous times to escape the threats made by the Taliban, and to seek a safer shelter.

56. In the U.S., Mr. Temory and his family members that were paroled have also been struggling to live without their missing mother, grandmother, and sisters. Working up to 55 hours a week and taking care of young children, Mr. Temory is trying to provide the best life that he can for

his children, but they are all suffering without their mother and other relatives. The youngest son in the U.S. cannot eat or sleep, and the daughters cry in school at the thought of their mother and relatives' lives being in danger. The constant fear has caused them to lose weight and become unhealthy, physically and mentally. They are aware of the imminent violence that their mother and sisters will face if they are not immediately paroled into the U.S. and escape the Taliban regime.

## COUNT I
### Violation of the APA, 5 U.S.C. § 706
### Agency Action Unlawfully Withheld and/or Unreasonably Delayed

1. The above paragraphs are incorporated by reference.

2. The APA mandates that an agency "shall conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). It also grants this Court the power to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

3. Plaintiffs have a clear right to apply for and receive a timely determination on their applications for parole for "urgent humanitarian reasons" under 8 U.S.C. § 1182(d)(5)(A), and USCIS has a duty to timely adjudicate the Plaintiffs' applications.

4. USCIS has unreasonably delayed and/or unlawfully withheld the adjudication of urgent applications filed by or on behalf of the Plaintiffs who have pending applications, in violation of the APA. *See* 5 U.S.C. §§ 555(b), 706(1).

## COUNT II
### Mandamus, 28 U.S.C. § 1361

5. The above paragraphs are incorporated by reference.

6. The Mandamus Act, 28 U.S.C. § 1361, grants authority to courts to compel defendants to perform a duty owed to a plaintiff.

7. The Plaintiffs who have pending applications have a clear right receive a determination on their applications for humanitarian parole. USCIS has failed to discharge its mandatory duty to issue an adjudication and those Plaintiffs lack an adequate remedy other than

13

this litigation. Mandamus relief is therefore appropriate.

## COUNT III
### Declaratory Judgment, 28 U.S.C. § 2201

8. The above paragraphs are incorporated by reference.

9. The Declaratory Judgment Act, 28 U.S.C. § 2201, grants authority to courts to "declare the rights and other legal relations of any interested party."

10. Plaintiffs are entitled to a declaration that USCIS has improperly changed its adjudication standards and ignored agency standards, rules, or procedures in its handling of Plaintiffs' and others' applications for humanitarian parole on behalf of Afghan nationals, and—in the case of the pending plaintiffs—that USCIS has unreasonably delayed and unlawfully withheld adjudication of these applications.

### **PRAYER FOR RELIEF**

Plaintiffs request that the Court grant the following relief:

**A.** Order Defendants to promptly adjudicate each of the unadjudicated humanitarian parole applications filed on behalf of any of the Plaintiffs in accordance with the standards in effect on August 31, 2021 and the Policy Manual's provisions for the issuance of RFEs, NOIDs, and denials;

**B.** Retain jurisdiction during the adjudication or re-adjudication of Plaintiffs' humanitarian parole applications in order to ensure compliance with the Court's orders;

**C.** Award the Plaintiffs reasonable costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

**D.** Grant such other relief as the Court may deem just and proper.


Dated: March 10, 2023

Respectfully submitted,

/s/ *Aleksandra Peryeva*
Aleksandra Peryeva, Esquire
Curran, Berger & Kludt
79 Masonic Street
Northampton, MA 01060
(413) 584-3232
ap@cbkimmigration.com

14