# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

**LESLEY LAMARCHE, LATIFA RAHIMI, SONA RAHIMI, FAZAL AHMAD FAZLI, ENGEEL FAZLI, MOHAMMAD RIAZ FASLI, MOHAMMAD SOMAN FAZLI, MOHAMMAD SUBHAN FAZLI, NABIA FAZLI, MARZIA JAN MOHAMMED, JAN MOHAMMAD MOHAMMAD ISSA, GUL BANO MOHAMMAD DAWOOD, FATIMA MOHAMMAD HUSSAIN, SHEKOFA JAN MOHAMMAD, SHARIFA JAN MOHAMMAD, MOHAMMAD HASSAN JAN MOHAMMAD, MOTAHIRA TAJ MOHAMMAD, FATIMA JAN MOHAMMAD, KOWSAR ABDUL QAIYUM, TABASSUM TAJ MOHAMMAD, TAJ MOHAMMAD BAZ MOHAMMAD, ABDUL QAIYUM JUMA KHAN, SEDIQA JAN MOHAMMAD, MADHI ABDUL QAIYUM, MEHRIN TAJ MOHAMMAD, TAHA ABDUL QAIYUM, FARIDA TAHIRY, NASRULLAH TAHERI, AQILA SHARAFYAR, EQLIMA TAHIRY, NAJMA TAHIRY, MOHAMMAD R. TAHIRY, ASILA TAHERI, MAHMOOUD MANZOUR A/K/A SHAH MAHMOOD BAGRAMWAL, MOHAMMAD HASHIM AKA KHAIL, SUHAILA AKA KHAIL, ASMA AHMADZAI, FATIMA AHMADZAI, MOHAMMAD OSMAN AHMADZAI, RAZIA AKA KHAIL, SALMA AHMADZAI, ABIDA AHMADZAI, FROHAR ABDUL AWAL, ABDUL HAIDARI, ZAIKA HASSAS, SAFIULLAH FAISAL, SAMEER ULLAH FERDEVS, RASHID JAMALI,**

Case No. 3:23-CV-30029-MGM

**AMENDED
CLASS ACTION COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

**TAHIR REHAN, NASIMA REHAN, ANISA REHAN,** and **YOUSUF REHAN**, *on behalf of themselves and all those similarly situated*,

      Plaintiffs,

v.

**ALEJANDRO N. MAYORKAS**,
*in his official capacity as Secretary of Homeland Security*, and

**UR M. JADDOU**,
*in her official capacity as Director of U.S. Citizenship & Immigration Services*,

      Defendants.

## AMENDED CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

COME NOW, the above-named Plaintiffs, on behalf of themselves and other similarly situated individuals, by and through their undersigned attorneys, and respectfully bring this Amended Class Action Complaint for Declaratory and Injunctive Relief, and in support thereof allege as follows:

### INTRODUCTION

1.      For three (3) years now, tens-of-thousands of Afghans and their families, friends, supporters, Veterans, volunteers, advocates, scholars, organizations, and allies have been asking the same two (2) questions: (a) when will the 42,169 Afghan humanitarian parole applications currently pending before U.S. Citizenship & Immigration Services ("USCIS") ever be adjudicated; and (b) why Afghan humanitarian parole applications have languished while hundreds of

thousands of nationals from other countries have—vis-à-vis streamlined, online, and expeditious processes absent payment any filing fees—promptly received authorizations to travel to the United States pursuant to grants of humanitarian parole under the exact same legal authority as applications filed on behalf of Afghans.

2.      These Afghans and their supporters are entitled to answers to these valid questions as well as judicial redress of the agency action unlawfully withheld or unreasonably delayed by USCIS related to Afghan humanitarian parole applications.

3.      Plaintiffs therefore respectfully file this action requesting that the Court:  (a) certify, in accordance with FED. R. CIV. P. 23(b)(2)-(3), a class as defined and discussed at Paragraph No. 65  *infra*; and (b) issue a mandatory injunction directing USCIS to adjudicate each class member's parole application in accordance with the standards in effect prior to September 2021 within sixty (60) days or under a reasonable, Court-supervised adjudication plan.

## PARTIES

4.      Plaintiff Lesley LaMarche is a United States citizen residing in Massachusetts.  On or about March 14, 2022, she petitioned USCIS for Afghan humanitarian parole for Plaintiffs Latifa Rahimi, Sona Rahimi, Fazal Ahmad Fazli, Engeel Fazli, Mohammad Riaz Fazli, Mohammad Subhan Fazli, Mohammad Soman Fazli, and Nabia Fazli by properly filing a Form I-131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary.  The above-named Afghan humanitarian parole beneficiaries are currently in Afghanistan.

5.      Plaintiff Marzia Jan Mohammad is a United States citizen residing in Massachusetts.  On or about March 4, 2022, she petitioned USCIS for Afghan humanitarian parole for Plaintiffs Jan Mohammad Mohammad Issa, Gul Bano Mohammad Dawood, Fatima

Mohammad Hussain, Shekofa Jan Mohammad, Sharifa Jan Mohammad, Mohammad Hassan Jan Mohammad, Motahira Taj Mohammad, Fatima Jan Mohammad, Kowsar Abdul Qaiyum, Tabassum Taj Mohammad, Taj Mohammad Baz Mohammad, Abdul Qaiyum Juma Khan, Sediqa Jan Mohammad, Madhi Abdul Qaiyum, Mehrin Taj Mohammad, and Taha Abdul Qaiyum. by properly filing a Form I-131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary. The above-named Afghan humanitarian parole beneficiaries are currently in Pakistan.

6.     Farida Tahiry is a United States citizen residing in Pennsylvania. On or about October 27, 2021, she petitioned USCIS for Afghan humanitarian parole for Plaintiffs Nasrullah Taheri, Aqila Sharafyar, Eqlima Tahiry, Najma Tahiry, Mohammad R. Tahiry, and Asila Taheri by properly filing a Form I-131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary. The above-named Afghan humanitarian parole beneficiaries are currently in Pakistan.

7.     Mahmooud Manzour a/k/a Shah Mahmood Bagramwal is a United States citizen residing in New Jersey. On or about November 22, 2021, he petitioned USCIS for Afghan humanitarian parole for Plaintiffs Mohammad Hashim Aka Khail, Suhaila Aka Khail, Asma Ahmadzai, Fatima Ahmadzai, Mohammad Osman Ahmadzai, Razia Aka Khail, Salma Ahmadzai, and Abida Ahmadzai by properly filing a Form I-131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary. The above-named Afghan humanitarian parole beneficiaries are currently in Afghanistan.

8.     Frohar Abdul Awal is a United States citizen residing in Massachusetts. On or about December 6, 2021, he petitioned USCIS for Afghan humanitarian parole for Plaintiffs Abdul Haidari, Zaika Hassas, Safiullah Faisal, and Sameer Ullah Ferdevs by properly filing a Form I-

131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary.  The above-named Afghan humanitarian parole beneficiaries are currently in Pakistan.

9.     Rashid Jamali is a United States citizen residing in Washington.  In late 2021, he petitioned USCIS for Afghan humanitarian parole for Plaintiffs Tahir Rehan, Nasima Rehan, Anisa Rehan, and Yousuf Rehan by properly filing a Form I-131, Application for Travel Document, and funding the requisite filing fee of $575.00, for each prospective Afghan beneficiary.  The above-named Afghan humanitarian parole beneficiaries are currently in Afghanistan.

10.    Defendant Alejandro Mayorkas is the Secretary of the U.S. Department of Homeland Security ("DHS") and responsible for the administration of applicable laws and statutes governing immigration and naturalization.  He is generally charged with enforcement of the Immigration and Nationality Act and is further authorized to delegate such powers and authority to subordinate employees of DHS.  More specifically, the Secretary is responsible for administration of the Afghan humanitarian parole program at issue.

11.    Defendant Ur M. Jaddou is the Director of USCIS and responsible for the administration of immigration and naturalization adjudication functions and establishing immigration services policies and priorities.  These functions include administration of the Afghan humanitarian parole program at issue.

## JURISDICTION AND VENUE

12.    Jurisdiction of this Court is predicated on 28 U.S.C. § 1331 (federal question).

13.    Venue is proper in the District of Massachusetts under 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs Lesley LaMarche, Marzia Jan Mohammad, and Frohar Abdul Awal reside in

this district, there is no real property at issue, the Defendants are U.S. agencies and officers sued in their official capacities.

## FACTUAL ALLEGATIONS & LEGAL BACKGROUND

### *Countless Afghans Supported the United States Government and Worked to Build Democracy and Human Rights in Afghanistan*

14.     In 2001, a coalition of forces led by the United States invaded and occupied Afghanistan in the aftermath of the 9/11 terrorist attacks.

15.     At the time, the Taliban, an Islamic fundamentalist regime, controlled the country and strictly enforced its hardline interpretation of Sharia Law, Islam's legal system as set forth in the Quran.

16.     Under Taliban rule, public demonstrations, as well as most forms of music, photography, and cinema, were banned.  *See* Clayton Thomas, *U.S. Military Withdrawal and Taliban Takeover in Afghanistan: Frequently Asked Questions*, CONGRESSIONAL RESEARCH SERVICES (Sept. 17, 2021) (available at http://bit.ly/43oiteA). Women and girls could not work, attend school, or leave home without a male guardian, and they were required to cover their faces and bodies with burqas.  *Id.* at p. 32.  Anyone who violated the Taliban's rules faced public flogging, maiming, stoning, or execution.  *Id.* at pp. 1, 32.

17.     For more than twenty (20) years thereafter, the United States maintained a strong military presence in Afghanistan.  It did so to counter the Taliban, support the creation and maintenance of a democratically elected government, and to aid reconstruction efforts within the country.  *See The U.S. War in Afghanistan (1999-2021)*, COUNCIL ON FOREIGN RELATIONS (available at  https://bit.ly/46ZKA6a); *see also* Thomas, *supra*, at pp. 3-6.

18.     Thousands of Afghan people—among them business owners, language interpreters, healthcare workers, and physical laborers—supported military efforts by United States and

coalition forces.  Others worked to rebuild Afghan civil society and establish a democratically elected government.  Still others supported and promoted civil rights, including equality for women, in direct conflict with the Taliban's beliefs.  Supporting the United Stated and these ideals made such Afghans targets of the Taliban and other affiliated radical religious and ideological groups.  *See, e.g.*, U.S. DEP'T OF STATE, 2019 COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES: AFGHANISTAN (2019) (available at http://bit.ly/3zRqmf2).

19.     The efforts of the Afghan people and the United States bore fruit.  In 2004, the Afghan people approved a new constitution and held democratic elections. *See* Sharon Otterman, *Afghanistan: The New Constitution*, COUNCIL OF FOREIGN RELATIONS (Feb. 3, 2005) (available at  http://on.cfr.org/3mv8lur).  The mortality rate of children under five (5) dropped by over fifty (50) percent between 2000 and 2019.  *See* "What We Need to Learn: Lessons from Twenty Years of Afghanistan Reconstruction," SPECIAL INSPECTOR GENERAL FOR AFGHANISTAN RECONSTRUCTION (Aug. 2021) (available at http://bit.ly/3GAyB2X).  During the same period, Afghanistan's human development index (a summary of average achievements in key areas of human development tracked by the United Nations Development Programme) increased forty-five (45) percent.  *Id.*  "Between 2002 and 2019, Afghanistan's GDP per capita nearly doubled and overall GDP tripled, even accounting for inflation." *Id*.

20.     Between 2005 and 2017, literacy rates for Afghans ages fifteen (15) to twenty-four (24) increased by twenty-eight (28) percent for men and nineteen (19) points for women. *Id.*  By 2018, eight-seven (87) percent of Afghan nationals lived less than two (2) hours from medical care; as such, life expectancy within the country increased from fifty-six (56) to sixty-five (65)— a sixteen (16) percent increase.  *See* John R. Allen & Vanda Felbab Brown, *The Fate of Women's Rights in Afghanistan*, BROOKINGS: THE BROOKINGS GENDER EQUALITY SERIES (Sep. 2020)

(available at https://bit.ly/3miOpk0); *What We Need to Learn: Lessons from the Twenty Years of Afghanistan Reconstruction,* SPECIAL INSPECTOR GENERAL FOR AFHGANISTAN RECONSTRUCTION (Aug. 2021) (available at https://bit.ly/3KqEPn7).

21.    In addition, the rights and freedoms of women and girls greatly expanded.  *See Women in Afghanistan: The Back Story,* AMNESTY INTERNATIONAL UK (Nov. 24, 2022) (available at https://bit.ly/3zOyoFg).  Between 2003 and 2017, female enrollment rates in primary school more than tripled, and female enrollment in secondary education grew from six percent to thirty-nine (39) percent.  *See* Allen & Felbab-Brown, *supra*.

22.    By 2019, women made up one-third of Afghanistan's university students and one-third of the country's civil servants. *See* Adam Gallagher, *To Protect Afghan Women's Rights, U.S. Must Remain Engaged*, UNITED STATES INSTITUTE OF PEACE (Oct. 23, 2019) (available at https://bit.ly/3motrQw). The life expectancy of Afghan women increased by ten (10) years, and their mortality rates during childbirth dropped by almost one-third.  *See* Allen & Felbab-Brown, *supra.*

### *In August 2021, the United States and Coalition Forces, Hastily Withdrew from Afghanistan, the Taliban Regained Control of the Country, and Urgent Humanitarian Crisis Followed*

23.    On April 14, 2021, President Biden announced that the United States would begin withdrawing its troops from Afghanistan on May 1, 2021. *See* President Joseph R. Biden, *Remarks by President Biden on the Way Forward in* Afghanistan, THE WHITE HOUSE: BRIEFING ROOM (Apr. 14, 2021) (available at https://bit.ly/3UvM3dS).

24.    As soon as the withdrawal started, the Taliban began an advance that captured significant sections of Afghanistan's rural areas.  *See* Clay Thomas, *supra.*

25.     By July 2021, the Taliban began seizing border crossings, and the United States started evacuating Afghan people who had previously worked for the United States or certain affiliated entities.  *Id.*; *see also* U.S. Embassy in Kabul, Operation Allies Refuge, U.S. EMBASSY IN AFGHANISTAN (July 17, 2021) (available at https://bit.ly/3KRkAjD).

26.     On August 6, 2021, the Taliban captured its first provincial capital in Afghanistan; barely a week later, it controlled the entire country except for Kabul.  *See* Thomas, *supra*, at p. 10.

27.     On August 15, 2021, the Taliban entered Kabul and completed its takeover of Afghanistan.  Then-President Ashraf Ghani fled the country.  *Id.* at pp. 10, 12-13.

28.     That same day, the United States began evacuating thousands of people from Hamid Karzai International Airport in Kabul.  *See* John R. Hoehn & Jeremiah Gertler, *Afghan Aerial Evacuation in Context*, CONGRESSIONAL RESEARCH SERVICE (August. 24, 2021) (available at https://bit.ly/40Z0jyw).

29.     Afghans with good faith and bona fide reasons to fear the Taliban converged on Kabul in the hope of fleeing to find safety and protection.  *See How the Taliban Stormed across Afghanistan in 10* Days, BBC NEWS (Aug. 16, 2021) (available at https://bbc.in/40YZqpB).

30.     On August 30, 2021, the United States completed its withdrawal of troops from Afghanistan. *See Human and Budgetary Costs to Date of the U.S. War in Afghanistan, 2021-2022,* BROWN UNIVERSITY:  WATSON INSTITUTE INTERNATIONAL & PUBLIC AFFAIRS (Aug. 2021) (Aug. 2021) (available at https://bit.ly/3UrAwMO). Days later, the Taliban announced a caretaker government.  *See* Thomas, *supra*, at 14.  The Taliban has controlled Afghanistan ever since.

31.     The hasty nature of the withdrawal of the United States from Afghanistan left our Afghan allies exposed.  Aside from a brief ceasefire, the United States-Taliban withdrawal deal did not include protections for the countless Afghan people who had helped the United States

military and worked to rebuild their country and government.  *See* Remarks by President Biden on Afghanistan, THE WHITE HOUSE: BRIEFING ROOM (Aug. 16, 2021) (available at https://bit.ly/41hX01C).  Civil liberties for women and girls started to erode as soon as the Taliban returned to power.  The acting mayor of Kabul, for instance, announced his plan to fill every municipal city job held by women with men.  *See Taliban tells women and girls to stay home from work and* school, CBS NEWS (Sep. 20, 2021) (available at https://cbsn.ws/3nZVUgl).  Women involved in protests for women's rights were arrested or disappeared without explanation.  *See* D. Zucchino & Y. Akbary, *Threatened and Beaten, Afghan Women Defy Taliban With Protests*, NEW YORK TIMES (Jan. 24, 2022) (https://bit.ly/4cAtflt).

32.    The United States Embassy warned that the Taliban was committing war crimes. *See* Matthieu Aikins, *Inside the Fall of* Kabul, NEW YORK TIMES (Dec. 10, 2021) (available at https://nyti.ms/3KtQVMi).

***Initial Efforts to Evacuate Afghans Vis-à-vis
Humanitarian Parole Have Unreasonably Stalled***

33.    Amidst this backdrop, as chaos consumed Kabul in August 2021 during the final days of the United States military presence in Afghanistan, USCIS officials scrambled to manage the unfolding crisis.

34.    On August 13, 2021, agency officials received instructions to exclusively process Afghan humanitarian parole cases, and the Chief of the Humanitarian Affairs Branch, John W. Bird, instructed staff the next day to: "drop everything, and focus on completing all Afghan parole cases."  *See* Excerpt of Administrative Record ("AR Excerpt") (filed herewith as **Exhibit A**) at USCIS-0297-298.

35.    This same official recognized, "the situation is deteriorating . . . [i]t is a ***crucial life and death situation*** for the parole beneficiaries in Afghanistan, and we need to complete these

cases as soon as possible.  Please stop working on everything except the Afghan cases."  *Id.* (emphasis added).

36.    This guidance was reiterated on August 31, 2021:  "continue to complete the Afghan cases that you have, as expedite parole cases, until further notice."  *Id.* at USCIS-0311.

37.    From July 1, 2021, to September 1, 2021, USCIS did its best to abide by its "target processing time" for humanitarian parole requests, which was to "complete 90% of [its] cases within 90 days."  *See* AR Excerpt (filed herewith as **Exhibit B**) at USCIS-0314-315.

38.    During this timeframe, USCIS "approved 100% of the Afghan cases requested by State . . . and 95% of the Afghan Forms I-131 . . . ."  *Id.*

39.    As early as August 24, 2021, officials recognized the need to "temporarily surge staffing within USCIS for processing humanitarian parole applications."  *See* AR Excerpt (filed herewith as **Exhibit C**) at USCIS-0299.

40.    USCIS thereafter published a broadcast message to staff soliciting volunteers for temporary assignment assisting with processing Afghan humanitarian parole applications.  *Id.* at USCIS-0375-376.

41.    USCIS executive management received "an outpouring of interest from the detail solicitation," including at least 319 volunteers.  *Id.* at USCIS-0378.

42.    The philosophy and attitude at that time was to "endeavor to ensure that our staff available for processing parole requests for Afghans is able to keep up with receipts that come in . . . [t]hough we may need a steer from the front office in terms of priorities and surging resources, which means pulling from one location to another."  *See* AR Excerpt (filed herewith as **Exhibit D)** at USCIS-0302.

43.    Executive management calculated that USCIS "would need over 500 adjudication officers to keep up," but ultimately (absent any explanation in the record) decided to "begin with 50-60 adjudication officer detailees, along with 15-20 supervisors, and 20-30 support staff." *See* Exhibit C at USCIS-0375-376.

44.    On September 1, 2021, USCIS abruptly changed the expedited processing of Afghan humanitarian parole applications: "D1 made the decision yesterday evening that we can no longer expedite all Afghan parole requests." *See* Exhibit A at USCIS-0312 (it is unknown who "D1" refers to).

45.    Subsequently, on September 7, 2021, USCIS executive management instructed "staff to temporarily hold off on issuing any decisions for Afghan nationals seeking parole" and suggested the appropriate course of action might be to "put them all on hold and stop the clock." *See* AR Excerpt (filed herewith as **Exhibit E**) at USCIS-0341.  Via electronic mail marked "URGENT" adjudicators were instructed to "HOLD DECISIONS on AFGHAN CASES" noting that "[t]his hold only applies to Afghan cases." *See* Composite of FOIA Production (filed herewith as **Exhibit F**) at US0271.

46.    A few days later, another official at USCIS instructed:  "Please note that this hold is still operative for now.  I caught a case going out this afternoon and asked State to hold issuing the final travel document.  Please do NOT send final approvals or denials of Afghan cases at this time until we advise you to do so." *See* Exhibit E at USCIS-0350 (emphasis in original).

47.    That same official reiterated: "We are advised this morning to hold all decisions on Afghan parole cases.  Please do NOT send Afghan parole cases (I131 or State SPBP) to the administrative staff for delivery, and administrative staff, if you have Afghan cases pending

sending out any notices, please hold them and do not send by mail or email.  Please continue to accept Afghan cases that are filed . . . ."  *Id.* at USCIS-0351 (emphasis in original).

48.    Separately, in light of the $575.00 filing fee for each and every Form I-131 (humanitarian parole application), USCIS officials considered waiving the requisite fee: "[l]eadership would also like us to exempt the I-131 fee for Afghan nationals that may seek humanitarian parole . . . [t]hey were flexible about timeframe to have the exemption in place . . . but thought that one year from publication made sense".  *See* Exhibit E at USCIS-0302, pp. 3-4; *see also* Exhibit F at US0186-0189.

49.    However, executive management at USCIS ultimately declined to extend the fee exemption for humanitarian parole applications for Afghans.  *See* Exhibit E at USCIS-0301 (noting "Re: the parole fee exemption, they are looking for an approved parole from USCIS to be their ticket to be evacuated").

### *USCIS Substantially Changes Afghan Humanitarian Parole Program Metrics and Eligibility Criteria*

50.    As of October 26, 2021, USCIS executive management noted:  "[w]e should prioritize processing of beneficiaries outside of Afghanistan, but still process some inside Afghanistan." *See* Exhibit F at US0364.

51.    On November 1, 2021, USCIS published formal guidance requiring any Afghans seeking humanitarian parole to first leave Afghanistan in order to complete processing of their parole.  *See* AR Excerpt (filed herewith as **Exhibit G**) at USCIS-0453, 0458.  In other words, adjudication of applications for humanitarian parole for the benefit of Afghans then residing in Afghanistan and Pakistan was effectively suspended.

52.    Executive management at USCIS decided that Afghans in Pakistan would not be able to consular process in Pakistan.

53.    Executive management at USCIS decided to prioritize parole applications based on whether the beneficiary is in a location with a United States Embassy or consulate "such that the parole process can be completed."  *See* Defs.' Opp. to Pls.' Mot. for Class Cert. (Dkt. No. 60) at p. 13.

54.    Executive management at USCIS decided to deprioritize processing for "those who must travel to another country to complete consular processing."  *Id.* at 14.

55.    USCIS successively altered its standards to deprioritize the adjudication of parole applications for Afghan nationals located in Afghanistan and Pakistan without publicly announcing these changes or providing a reasoned basis for them.  USCIS also applied those changes to pending applications for Afghan humanitarian parole already on file without notifying applicants.

56.    USCIS retroactively applied the new policy requiring any Afghans seeking humanitarian parole to first leave Afghanistan (or Pakistan) to applications already approved by USCIS and those pending adjudication without public notice or notice to applicants and their attorneys.

57.    Per the latest publicly available information, 42,169 Afghan humanitarian parole applications are currently pending adjudication before USCIS, notwithstanding extreme threats to life and the safety of many of the beneficiaries concerned.  *See* American Immigration Council, "Agency Failures Make Obtaining Humanitarian Parole Almost Impossible for Afghans" (Mar. 16, 2023) (citing document production obtained pursuant to Freedom of Information Act, 5 U.S.C. § 552) (available at https://bit.ly/3MdjTkJ) (filed herewith as **Exhibit H**).

58.    The data collected and analyzed by the American Immigration Council demonstrates that "it was extremely difficult for Afghan applicants who directly requested

humanitarian parole through the I-131 process to have their cases adjudicated even though the agency collected extensive fees." *Id.* Indeed, the total amount of filing fees funded by Form I-131 Petitioners and received by USCIS in connection with the 42,169 Afghan humanitarian parole applications currently pending before USCIS amounts to approximately $24,247,175.00. USCIS continues to fail to adjudicate the vast majority of Afghan humanitarian parole applications.

### *Meanwhile, Humanitarian Parole Programs for the Benefit of Non-Afghan Populations Have Created Viable Pathways to the United States for Hundreds of Thousands (for Free)*

59.    During the pendency of these above-referenced Afghan humanitarian parole applications, the United States Government implemented several new streamlined, expedited, online, and completely free processes for several populations of non-Afghan nationals seeking humanitarian parole as refuge and protection from war, violence, persecution, and civil unrest, including Ukrainians, Cubans, Haitians, Nicaraguans, and Venezuelans. *See* U.S. DEP'T OF STATE, "Ukrainian Arrivals through the U.S. Refugee Admissions Program (USRAP) (filed herewith as **Exhibit I**); *see also* U.S. DEP'T OF HOMELAND SECURITY, "Fact Sheet: Data From First Six Months of Parole Processes for Cubans, Haitians, Nicaraguans, and Venezuelans Shows That Lawful Pathways Work" (Jul. 25, 2023) (filed herewith as **Exhibit J**).

60.    Under these programs, the United States Government has approved travel authorizations for and granted parole for over 170,000 Ukrainians, as well as more than 38,000 Cubans; 63,000 Haitians; 29,500 Nicaraguans; and 58,000 Venezuelans. *See* Exhibits I and J.

61.    In other words, the United States Government has expeditiously paroled into the United States over 358,500 individuals from five (5) different countries, none of whom were required to depart their country of origin prior to receiving travel authorizations. *Id.*

62.    This amounts to over eight and one-half (8.5) times the number of Afghan humanitarian parole applications currently pending adjudication before USCIS, upon its receipt of at least $24,247,175.00 in filing fees.

## CLASS ACTION ALLEGATIONS

63.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to FED. R. CIV. P. 23(a) and 23(b)(2)-(3). A class action is proper because this action involves questions of law and fact common to the class and the class is so numerous that joinder of all members is impracticable. The claims of Plaintiffs are typical of the claims of the class.

64.    Plaintiffs will fairly and adequately represent the interests of the class, and Defendants have acted on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate with respect to the class as a whole.

65.    Plaintiffs seek to represent the following class:

> **All petitioners who filed applications for humanitarian parole for the benefit of Afghan nationals, and all potential beneficiaries of those applications: (a) who filed on or after August 1, 2021; and (b) who are located in Afghanistan or Pakistan.**

66.    The proposed class is so numerous that joinder of all members is impracticable. Plaintiffs are not aware of the precise number of potential members but reasonably estimate that there are at least 1,000 class members. This estimate is based upon the last publicly available information that 42,169 Afghan humanitarian parole applications remain pending adjudication before USCIS. *See* Exhibit H at p. 3.

67.    Questions of law and fact that predominate over any questions affecting Plaintiffs and include:

(a) Did USCIS implement one set of initial standards, accept applications, and then issue different, more rigid standards,

procedures, rules, and/or requirements to halt processing and adjudicating applications for Afghan humanitarian parole on or about September 2021 and periodically thereafter?

(b) Did USCIS implement new adjudication standards relating to Afghan humanitarian parole beginning in September 2021 with the effect of decreasing the number of Afghan beneficiaries granted humanitarian parole?

(c) Did USCIS fail to engage in a reasoned process and fail to consider all relevant factors prior to implementing changes to adjudication standards relating to Afghan humanitarian parole that resulted in a much smaller percentage of potential Afghan beneficiaries receiving adjudications for humanitarian parole?

(d) Prior to changing its adjudication standards, did USCIS consider important Afghan humanitarian parole issues including the reliance interests of the applicants and beneficiaries who paid a total or more than 20 million dollars in application fees and were and are, in many cases, hiding from the Taliban in Afghanistan or Pakistan?

(e) Were the changes by USCIS to adjudication standards arbitrary and capricious and otherwise in violation of the APA (5 U.S.C. § 706)?

(f) Did USCIS act contrary to law by making changes to adjudication standards that ended consideration on a case-by-case

basis of Afghan humanitarian parole applications as required under 8 U.S.C. § 1182(d)(5)(a)?

(g) Were the changes by USCIS to adjudication standards related to Afghan humanitarian parole contrary to the procedures set forth in the USCIS Policy Manual?

(h) Have revised adjudication standards related to Afghan humanitarian parole resulted in unlawfully withheld adjudications of applications in violation of the APA (5 U.S.C. § 706(1)(a)?

68.     The claims of both Plaintiff-Petitioners and Plaintiff-Beneficiaries are typical of those of the entire class.

69.     Plaintiffs and undersigned counsel will fairly and adequately represent the interests of the proposed class as they seek relief on behalf of the class as a whole and they have no interests antagonistic to the class members.

70.     Plaintiffs are represented by competent counsel with extensive experience in both complex class actions and immigration law.

71.     The arbitrary, capricious, and unlawful changes by USCIS to adjudication standards and procedures regarding Afghan humanitarian parole applications predicated on urgent humanitarian grounds in and after September 2021 resulted in adjudications being withheld for Plaintiffs and other Afghans located in Afghanistan and Pakistan. Pursuant to unlawfully revised adjudication standards, USCIS has acted, is acting, and will continue to act to the detriment of all proposed class members. Therefore, final declaratory or other relief is appropriate to remedy the harms that affect all class members, and the class should be certified under FED. R. CIV. P. 23(b)(2)-(3).

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the APA [5 U.S.C. § 706]**
*Impermissible Construction of*
*Humanitarian Parole Statute*

72.    Plaintiffs adopt, repeat, and reallege all foregoing allegations in Paragraphs 1-71 above as though fully stated and set forth herein.

73.    USCIS implemented new adjudication standards relating to Afghan humanitarian parole beginning in September 2021 and periodically thereafter that halted processing and decreased the opportunity for Afghan beneficiaries within Afghanistan and Pakistan to receive adjudications and favorable grants of humanitarian parole.

74.    The blanket policy is not in accordance with the humanitarian parole statute that requires parole decisions "on a case-by-case basis."  *See* 8 U.S.C. § 1182(d)(5)(A).

75.    Agency action that is "not in accordance with law" violates the APA.  *See* 5 U.S.C. § 706(2)(A).  In contravention of the requirements set forth in the statute, USCIS has substituted case-by-case adjudication for nearly categorical rules resulting in the denial, revocation, and failure to adjudicate Afghan humanitarian parole applications for Afghan nationals located in Afghanistan and, on information and belief, also for Afghan nationals located in Pakistan.

**COUNT II**
**Violation of the APA, 5 USC § 706**
*Arbitrary and Capricious Action*

76.    Plaintiffs adopt, repeat, and reallege all foregoing factual allegations in Paragraphs 1-71 above as though fully stated and set forth herein.

77.    The APA directs reviewing courts to invalidate agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A).

78.     Agency action is arbitrary and capricious when an agency relies on factors which Congress did not intend it to consider, fails to consider an important aspect of a problem, or offers an explanation for its decision that runs counter to the evidence before the agency.  *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, agency action is arbitrary and capricious where an agency ignores serious reliance interests and fails to consider all relevant factors when issuing new rule, regulation, or policy.  *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020).

79.     Prior to September 2021, USCIS accepted fees for Afghan parole applications under lenient guidelines for case-by-case adjudications.

80.     On or about September 2021 and periodically thereafter, USCIS implemented different  standards to effectively shut down the favorable adjudication of Afghan humanitarian parole applications filed on behalf of Afghans located in Afghanistan and Pakistan.

81.     USCIS did not provide applicants or the public notice of the new blanket policy to restrict favorable processing.

82.     USCIS applied new adjudication standards to previously approved applications and, in some instances, revoked prior approvals.

83.     The implementation of new adjudication standards by USCIS for Afghan humanitarian parole applications was arbitrary and capricious, and otherwise in violation of the APA. 5 U.S.C. § 706(2)(A).

## COUNT III
## Declaratory Judgment, 28 U.S.C. § 2201

84.     Plaintiffs adopt, repeat, and reallege all foregoing factual allegations in Paragraphs 1-71 above as though fully stated and set forth herein.

85.     The Declaratory Judgment Act, 28 U.S.C. § 2201, grants authority to courts to "declare the rights and other legal relations of any interested party."

86.     Plaintiffs are entitled to a declaration that USCIS improperly changed its adjudication standards and ignored governing law, including long time agency standards, rules, and / or procedures and unreasonably and unlawfully withheld the adjudication of Plaintiffs' and purported class members' humanitarian parole petitions.

## COUNT IV
## <u>Bad Faith</u>

87.     Plaintiffs adopt, repeat, and reallege all foregoing factual allegations in Paragraphs 1-71 above as though fully stated and set forth herein.

88.     Plaintiffs have submitted all the required documents and fees required yet are still awaiting adjudication of their humanitarian parole applications.

89.     USCIS has articulated no bona fide, facially legitimate, or reasonable basis for its failure and/or refusal to progress the humanitarian parole applications of Plaintiffs.

90.     As a direct and proximate result of the unreasonable delay, Plaintiffs have suffered and will continue to suffer.

91.     Plaintiffs have thus demonstrated a strong showing of bad faith or improper behavior because USCIS has adjudicated at least 358,500 humanitarian parole applications for the benefit individuals from five (5) different countries—none of whom were required to depart their country or origin prior to receiving travel authorizations—during the pendency of humanitarian parole applications at issue herein; the only difference is that none of them were for the benefit of Afghan nationals.

92.     This Court may invoke established exceptions and compel discovery in this case to look beyond the administrative record underlying the agency's delay or ultimate decision based on an apparent or established contrived and pretextual rationale.

### PRAYER FOR RELIEF

WHEREFORE, by and through undersigned counsel, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray that this Court enter an Order granting the following relief:

(1)     Certification under FED. R. CIV. P. 23(a) and 23(b)(2)-(3) the class defined as:  All petitioners who filed applications for humanitarian parole for the benefit of Afghan nationals, and all potential beneficiaries of those applications: (a) who filed on or after August 1, 2021; and (b) who are located in Afghanistan or Pakistan.

(2)     Appointment of the named Plaintiffs as class representatives and undersigned counsel as class counsel;

(3)     Declaring that USCIS's changes in adjudication standards for Afghan humanitarian parole applications in September 2021 and thereafter were arbitrary, capricious, and not in accordance with law;

(4)     Setting aside as arbitrary and capricious and not in accordance with law, USCIS's change in adjudication standards for Afghan humanitarian parole applications;

(5)     Declaring that USCIS has unlawfully withheld adjudicating humanitarian parole applications for Plaintiffs and class members;

(6)     Ordering Defendants to adjudicate each class member's parole application in accordance with the standards in effect prior to September 2021 within sixty (60) days or under a reasonable, Court-supervised adjudication plan.

(7)    Awarding Plaintiffs their reasonable costs and attorneys' fees incurred in this action under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(2); and

(8)    Granting such other and further relief as this Court deems appropriate, just, or equitable under the circumstances.

Dated:  August 21, 2024                    Respectfully submitted,

/s/ Jennifer Coberly                       /s/ Christopher W. Dempsey
JENNIFER R. COBERLY                        CHRISTOPHER W. DEMPSEY
Fla. Bar No. 930466*                       Fla. Bar No. 1038319
AMERICAN IMMIGRATION                       DEMPSEY LAW, PLLC
LAWYERS ASSOCIATION                        50 N. Laura Street, Suite 2500
1331 G Street NW                           Jacksonville, FL 32202
Washington, DC 20005                       Tele: 904-760-6272
Tel:  202-507-7692                         Fax:  904-587-0372
Email: jcoberly@aila.org                   Email:  chris@cdempseylaw.com
                                           Web:  www.cdempseylaw.com


/s/ Brian Green                            /s/ Aleksandra Peryeva
BRIAN GREEN                                ALEKSANDRA PERYEVA
Colo. Bar. No. 56087*                      (BBO #4823589)
LAW OFFICE OF BRIAN GREEN                  CURRAN, BERGER & KLUDT
9609 S University Boulevard, #630084       79 Masonic Street
Highlands Ranch, CO 80130                  Northampton, MA 01079
Tele: 443-799-4225                         Tele:  413-584-3232
Email: BrianGreen@greenUSimmigration.com   Email:  ap@cbkimmigration.com
Web: www.greenUSimmigration.com            Web:  www.cbkimmigration.com


/s/ Jesse Bless                            /s/ Sabrina Damast
JESSE BLESS                                SABRINA DAMAST*
BLESS LITIGATION, LLC                      LAW OFFICES OF SABRINA DAMAST, INC.
(BBO #660713)                              510 West 6th Street, Suite 330
6 Vineyard Lane                            Los Angeles, CA 90014
Georgetown, MA 01833                       Tele: 323-475-8716
Tele: 781-704-3897                         Email: sabrina@sabrinadamast.com
Email: jesse@blesslitigation.com           Web: www.sabrinadamast.com
Web:  www.blesslitigation.com

                                           **Counsel for Plaintiffs**


*Motion for leave to appear *pro hac vice* forthcoming.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August 21, 2024, I filed and served the foregoing with the Clerk of the Court by causing a copy to be electronically filed via the CM/ECF system.  I also hereby certify that the participants in the case are registered CM/ECF users and will be served via the CM/ECF system.

<u>/s/ Christopher W. Dempsey</u>
CHRISTOPHER W. DEMPSEY
*Counsel for Plaintiffs*