# EXHIBIT B

- **Over the last five years, how many parole applications have we received and adjudicated by year?**
  - Please see attached charts. Currently we have over 1,050 applications pending. Normally, we try to keep at having no more than 450 or so pending (an average of three months of receipts under steady-state), as our target processing time is to complete 90% of our cases within 90 days. We are not meeting our target.
- How many staff are dedicated to adjudicating these applications?
  - Until recently IRAD was authorized for 6 adjudication officers for parole applications. We have 3 on board and all three are serving as acting supervisory adjudication officers for refugee officers and others assigned to assist with the parole workload.
  - The Humanitarian Affairs Branch current staffing level is as follows:

| Staffing IRAD Humanitarian Affairs Branch | | |
|---|---|---|
| Position | Authorized | On Board |
| Section Chief | 1 | 1 |
| Supervisor | 3 | 1 |
| Adjudication Officers | 13 | 3 |
| Staff Assistant | 1 | 1 |
| Immigration Services Assistants | 4 | 0 |
| Total | 22 | 6 |

  - Until a few months ago, HAB had 6 authorized adjudication officers. Recently, OCFO approved an additional 7. IRAD is in the process of hiring. In the meantime, IRAD has assigned 13 refugee officers and a supervisory refugee officer to assist, and has 2 officer detailees from outside RAIO to support
  - IRAD is assessing our parole adjudication staffing needs taking into account our backlog of pending cases, the anticipated 4,000 FRTF parole cases, and Afghan parole cases, among others.
- How many Afghan related parole applications have come in thus far, by week?
  - OIDP has not yet been able to beak it down by week, but since July 1, the Lockbox has received over 1,350 requests for parole from Afghan nationals, of which 1,003 were accepted. Please see chart below for more details for Lockbox receipts.

| Form I-131 Humanitarian Parole Requests 7/1/2021 to 9/1/2021 | ACCEPTED | | | | Rejected | | | |
|---|---|---|---|---|---|---|---|---|
| | With Fee Paid | With Fee Waived | Fee Accepted Elsewhere | Total Accepted | Rejected FW Related | Rejected Not FW Related | Total Rejected | Total Processed |
| Non-Afghans | 413 | 26 | 98 | 537 | 79 | 27 | 106 | 643 |
| Afghans HP | 907 | 96 | | 1003 | 165 | 188 | 353 | 1,356 |
| All HP | 1 | | | 1 | | | | 1,462 |

1

USCIS-0314

- **How many of those that already came in are for people inside Afghanistan?**
    - We are unable to accurately assess that without looking at each case, but the vast majority have been for individuals inside Afghanistan.

- **Is it accurate for me to say that we have been expeditiously adjudicating those inside Afghanistan?**
    - Yes, USCIS prioritized the requests for parole for individuals inside Afghanistan during the evacuation. Staff worked overtime and weekends to approve those cases that were approvable and sent the approved lists daily to State. We also requested expedited NCTC checks and completed all the normal vetting before approval.

- **Of the applications already adjudicated, what is the approval rate?**
    - This year, we approved 100% of the Afghan cases requested by State (31 cases adjudicated) and 95% of the Afghan Forms I-131 (72 approved and 4 denied). These stats require explanation and may be misleading because we were focusing on just **getting the approvals** out in hopes of the beneficiaries getting on an evacuation flight. As such, these rates should not be used to anticipate what would be approved in the future, particularly as the volume increases and many people see parole as a ticket out of Afghanistan or to the U.S. (including those who may have been living in third countries for years or are not even Afghan nationals but seek to exploit the situation). Please see historic stats attached.

- **What is the denial rate?**
    - See note above and attached stats.

- **What are some of the reasons for denial?** Can we discuss?

- **Why do you believe that under current HP standards that a good number would be denied?**
    - We anticipate that a significant number of applications will be general pleas for help to get out of Afghanistan based on fear of harm. Please see attached policy guidance on the analytic framework for protection-related cases, beginning on page 59. Below is an excerpt, but good to read in context. Will discuss with you.

    *Generally, for you to find that there are urgent humanitarian reasons for parole in cases involving claims of targeted harm cases, you must find that the beneficiary is at imminent risk of serious harm. The claim may be based on specific threats targeting the beneficiary individually or, in some cases, the claim may be based on the beneficiary's membership in an at-risk group that has been specifically targeted for harm. In those cases, the evidence must show not only that members of the group are at risk of imminent harm, but that the individual or group targeting the at-risk group knows, or likely imminently will know, that the beneficiary is a member of that group. Imminent serious harm, in the context of parole cases, means an immediate and present threat of harm that could lead to serious injury (psychological or physical) or death.*

    *. . .*

    *In order to exercise discretion favorably in claims where the asserted urgent humanitarian reasons is solely a claim of targeted harm, there must be credible, third-party evidence of the threat. See discussion of evidence below. If there is no credible, third-party evidence of threat, but there are other compelling, positive factors associated with the case such that you believe that discretion should be exercised favorably in a particular case, please discuss with your supervisor.*

2

USCIS-0315